UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                                          Case No. 23-40908

SHEFA, LLC,                                                     Chapter 11

                Debtor.                          Judge Thomas J. Tucker

_____/

**OPINION REGARDING THE CITY OF SOUTHFIELD'S MOTION
TO CONVERT THIS CASE TO CHAPTER 7**

**I. Introduction**

      The Debtor, Shefa, LLC, filed this Chapter 11 case on January 31, 2023. This is the

Debtor's second Chapter 11 case. This current case is before the Court on a motion by the City

of Southfield, Michigan (the "City"), seeking an order converting the case to Chapter 7 (the

"Motion").[1] The City agrees that the Debtor belongs in bankruptcy, but under Chapter 7 rather

than Chapter 11. The City argues that there is "cause" to convert this case under 11 U.S.C.

§ 1112(b)(1), because the Debtor filed this Chapter 11 case in bad faith. More specifically, the

City's theory is that the Debtor's filing of this case under Chapter 11, rather than under Chapter

7, was done in bad faith.

      The Debtor filed an objection to the Motion. No one else filed a response to the Motion.

The Debtor and the City each have filed extensive briefs and many exhibits. The Court held a

telephonic hearing on March 22, 2023. Counsel for the City, the Debtor, and the United States

Trustee appeared and were heard. At the conclusion of the hearing, the Court took the Motion

---

[1] "Motion of City of Southfield, Michigan to Convert Case to Chapter 7" (Docket # 13).

under advisement.

The Court has considered all of the written and oral arguments of the parties, and all of the papers filed by the parties concerning the Motion, as well as other parts of the record in this case and in the previous Chapter 11 case filed by the Debtor, Case No. 14-42812. For the reasons stated in this Opinion, the Court will grant the Motion and convert this case to Chapter 7.

## II. Jurisdiction

This Court has subject matter jurisdiction over this bankruptcy case and this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and E.D. Mich. LR 83.50(a). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and 157(b)(2)(O), because it is a "matter concerning the administration of the estate," and because it is a proceeding "affecting . . . the adjustment of the debtor-creditor . . . relationship."

This proceeding also is "core" because it falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans–Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009) (citing *Mich. Emp. Sec. Comm'n v. Wolverine Radio Co., Inc.*, 930 F.2d 1132, 1144 (6th Cir. 1991)). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *see id.*, namely, Bankruptcy Code § 1112. And this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See id.* at 27.

## III. Background

2

**A. The Debtor and its property**

The Debtor is a Michigan LLC, whose sole member is Sidney Elhadad, a resident of
Montreal, Quebec, Canada.  The Debtor filed its first Chapter 11 case on February 25, 2014,
Case No. 14-42812 (the "First Chapter 11 Case").  In that case, the Court filed an opinion on
December 22, 2017, in which it described some of the background and facts that are relevant in
the current case.  The Court stated the following facts about the Debtor's real property (the
"Property"), which remain true today:

> [The] real property owned by the Debtor [is] located at 16400 J.L.
> Hudson Drive, Southfield, Michigan (the "Property").  The
> Property is the site of a 14-story, 427 room hotel built in 1974 on
> nine acres, known at different times as the Plaza Hotel and the
> Michigan Inn.  The Property has been vacant and shuttered since
> October 2010.  The Debtor acquired the Property in 2009.

*In re Shefa, LLC*, 579 B.R. 438, 440 (Bankr. E.D. Mich. 2017), *aff'd.*, No. 18-10073, 2019 WL
911692 (E.D. Mich. Feb. 25, 2019) (footnote omitted).[2]

The Property is the Debtor's only asset.  The Debtor describes the Property as "single
asset real estate," within the meaning of 11 U.S.C. § 101(51B).[3]  But it is undisputed that the
Debtor has no employees and operates no business on the Property.  The Debtor does not conduct
any business anywhere, has no income, and does not hope or plan to conduct any business, or to
reorganize in Chapter 11.  Rather, the Debtor says that it filed this Chapter 11 bankruptcy case in

---

[2] The cited opinion was written by the undersigned judge.  The First Chapter 11 Case originally was
assigned to Judge Phillip J. Shefferly.  Judge Shefferly recused himself on November 20, 2017, and the case
then was assigned to the undersigned judge, by blind draw.  Judge Shefferly later retired, and the current case
is assigned to the undersigned judge.

[3] *See, e.g.*, the Debtor's Petition (Docket # 1) at ¶ 7.

3

order to liquidate, by marketing and selling the Property, and by distributing the sale proceeds. The Debtor *hopes* to be able to pay all creditors in full, and to distribute a surplus to itself, for the benefit of its sole member.[4]

## B. The Debtor's First Chapter 11 Case

The Debtor's First Chapter 11 Case resulted in a confirmed plan in 2016, but that plan was never fully performed. This Court previously described the prior case, in part, in this way:

> The Debtor filed this Chapter 11 case on February 25, 2014. At that time, no real estate taxes had been paid on the Property since 2005, and no payments for water and sewerage charges had been made since July 2009. As of the petition date, the Debtor owed Oakland County a total of $3.787 million, consisting of $1.917 million in delinquent real estate taxes plus $1.87 million for water and sewerage charges. Two years after filing this case, and after considerable litigation and two extensive mediation sessions, the Debtor was able to confirm a consensual Chapter 11 plan, on February 19, 2016. The confirmed [p]lan contemplated, among other things, that the Debtor would make a substantial payment to Oakland County, and obtain financing in order to renovate and reopen the Property as a hotel.

*In re Shefa, LLC*, 579 B.R. at 440. The "confirmed [p]lan contemplated that the Debtor would renovate the Property, and would spend at least $2.1 million in doing so." *Id.* at 441. Under the complex terms of the confirmed plan, the Debtor gave a mortgage on the Property to the City, which the City had to release if the Debtor met certain requirements. The City still holds that mortgage.

After confirmation of its plan, the Debtor never actually obtained financing to renovate

---

[4] *See, e.g.*, Debtor's Obj. to City of Southfield's Mot. to Convert and Br. (Docket # 27) at 2 ¶ 4, 5 ¶ 12, 6 ¶ 16.

and reopen the Property.  The confirmed plan also permitted the Debtor, in the alternative, to sell the Property, subject to certain terms of the plan.  But despite efforts to sell the Property over the years (discussed in more detail below), the Debtor never was able to do so.

## C.  More recent events

The Debtor largely blames these failures on the City, alleging that the City unreasonably and improperly has failed to cooperate with the Debtor's efforts.  The City denies the Debtor's allegations, and blames the Debtor for these failures.

In addition, the City alleges the following in its Motion, among other things:

> When the Debtor's business operations ceased nearly thirteen years ago, the furnishings were left on site and the Property was not adequately secured.  As a result, the Property has been a haven for vagrants and other intruders, and a frequent target of vandalism. Between March, 2022 and January, 2023, the Southfield Police Department were summoned to the Property nearly thirty times, resulting from incidents involving persons who had infiltrated the Property.  Many of the incidents stemmed from reports of persons hurling objects at passersby and vehicles from inside the building or from the roof.  Some resulted in damage to vehicles. Additionally, on March 2, 2019, a fire was started by an intruder, requiring a response from five departments, which resulted in injury to a firefighter.[5]

The City's Motion further states that "[t]he deplorable condition of the Property was recently documented in a You Tube video, ironically (but not surprisingly) taken by intruders. https://www.youtube.com/watch?v=9k8MNGHwEYU."[6]

---

[5]  Motion (Docket # 13) at 2-3 ¶ 4.

[6]  *Id.*  The 13-minute You Tube video cited by the City apparently was made in December 2022.  The Debtor has not disputed the authenticity of the video or objected to the Court considering it.  The Court has viewed the video.  The exterior and interior parts of the Property shown in the video are in an appalling condition.

The Debtor does not deny the poor condition of the Property. But the Debtor alleges, among other things, that "[t]he City has failed to provide police support for the Debtor to keep trespassers out," and that the Debtor "has hired a security company for 24/7 monitoring and guarding of the Property."[7] And the Debtor hopes that soon it will be able to sell the Property, for at least $5.9 million.

After the First Chapter 11 Case ended, the disputes between the Debtor and the City led to years of substantial and continuous litigation, in both state and federal courts. This includes the following recent developments in two state court lawsuits, which have prompted the Debtor to file the current bankruptcy case.

First, the City filed an action in 2020 in Michigan's 46th District Court (the "46th District Court case"), alleging "ordinance/zoning violations" with respect to the Property.[8] That led to the entry of a consent judgment on January 21, 2021.[9] The consent judgment stated that "as owner[]of the subject building," the Debtor "admits that it is responsible for the violations at the [P]roperty caused by third parties."[10] Among other things, the consent judgment required the Debtor to "abate the violations at the [P]roperty by boarding all open/broken windows/doors;" to "continue to monitor the building to make sure it remains secure and not open to the elements or

---

[7] Debtor's Objection to City of Southfield's Motion to Convert and Brief (Docket # 27) at 4-5, ¶ 11.

[8] *See* "Consent Order" entered in the case of *People of the City of Southfield v. Shefa, LLC*, Case No. 20-S-0008751 ON (Docket 13-3) at p. 1.

[9] *Id.*

[10] *Id.* at 1 ¶ 1.

intruders;" and to "keep the [P]roperty free of debris, weeds, and garbage."[11]   Recently, the City filed a motion to hold the Debtor in contempt, for allegedly failing to comply with the consent judgment.  The state court issued a show cause order requiring the Debtor to appear at a hearing scheduled for February 16, 2023.

Second, the City filed an action against the Debtor in Oakland County Circuit Court (the "Oakland County case"), claiming that under state law, the Property was a "nuisance" and a "dangerous building," and seeking the appointment of a receiver to secure and maintain the Property, and to market and sell the Property.[12]  So far in that case, the City obtained an order on January 24, 2023 appointing a receiver, for the initial, limited purposes of "assess[ing] the situation at [the Property], and "tak[ing] measures to secure the building and maintain health and safety at the building."[13]  A hearing was scheduled for the morning of February 1, 2023, regarding clarification of that receivership order, but the Debtor filed this bankruptcy case the night before that hearing, on January 31, 2023 at 11:57 p.m.  Because of the bankruptcy filing, no receiver is actually in place.

**IV.  Discussion**

**A.  General principles under § 1112(b)(1)**

In seeking conversion based on the Debtor's alleged bad faith, the City relies on the "cause" standard in Bankruptcy Code § 1112(b)(1).  That section states:

---

[11] *Id.* at 2 ¶¶ 2, 3.

[12] *See* "Plaintiff City of Southfield, Michigan's Renewed Motion for Appointment of Receiver," filed in *City of Southfield, Michigan v. Shefa, LLC*, Case No. 2019-175286 (Docket # 13-8) at 7-8.

[13] *See* "Entry of Order" (Docket # 13-9) at 1 ¶ 2.

7

> (b)(1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, **for cause** unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added).

Sixteen specific examples of "cause" are listed in §§ 1112(b)(4)(A) through 1112(b)(4)(P),[14] but the City does not rely on any of these in its Motion. Rather, the City cites the general term "cause" in § 1112(b)(1).

The United States Court of Appeals for the Sixth Circuit has held repeatedly that the general term "cause" in § 1112(b)(1) includes bad faith by the debtor in filing the Chapter 11 case. *See Trident Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co.* (*In re Trident Assocs. Ltd. P'ship*), 52 F.3d 127, 130 (6th Cir. 1995) ("The bankruptcy court may dismiss a Chapter 11 petition 'for cause.' 11 U.S.C. § 1112(b). We have consistently held that a debtor's Chapter 11 petition may be dismissed if it was filed in bad faith."); *Michigan Nat'l. Bank v. Charfoos* (*In re Charfoos*), 979 F.2d 390, 392 (6th Cir. 1992) (citations omitted) ("It is well settled that even though Chapter 11 does not expressly so state, bad faith may serve as a ground for dismissal of a petition."); *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1137 (6th Cir. 1985) (same).

In determining whether there is "cause" to dismiss or convert due to bad faith under § 1112(b)(1), the Court must apply the following principles, and consider the following factors:

---

[14] 11 U.S.C. § 1112(b)(4). "Section 1112(b)(4) contains a nonexhaustive list of examples of 'cause' justifying dismissal of a Chapter 11 case. These examples include 'substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation[.]' 11 U.S.C. § 1112(b)(4)(A)." *In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 60 (B.A.P. 6th Cir. 2013).

8

Under § 1112(b) a court may dismiss a Chapter 11 petition "for cause." . . . [Section] 1112(b) [does not] define "cause," so "courts must determine whether discretionary relief is appropriate on a case-by-case basis." [*Laguna Assocs. Ltd. P'ship v. Aetna Cas. & Surety Co.* (*In re Laguna Assocs. Ltd. P'ship*), 30 F.3d 734, 737 (6th Cir. 1994)]. Under . . . [§1112(b)], bad faith can constitute cause. *Id*. at 737-38. Because the "totality of the circumstances" must be considered, no single test for good faith can be recited, but this court has laid out some guidelines:

> [G]ood faith is an amorphous notion, largely defined by factual inquiry. While no single fact is dispositive, courts have found the following factors meaningful in evaluating an organization debtor's good faith:
>
> (1) the debtor has one asset;
>
> (2) the pre-petition conduct of the debtor has been improper;
>
> (3) there are only a few unsecured creditors;
>
> (4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;
>
> (5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;
>
> (6) the filing of the petition effectively allows the debtor to evade court orders;
>
> (7) the debtor has no ongoing business or employees; and
>
> (8) the lack of possibility of reorganization.

*Id*. at 738 (citations and internal quotations omitted).

9

*Trident Assocs.*, 52 F.3d at 131.

The Sixth Circuit has held that in an appropriate case, the second of the above factors, improper pre-petition conduct by the debtor, by itself can be sufficient to establish bad faith, and therefore establish cause to dismiss or convert under § 1112(b)(1). *See Charfoos*, 979 F.2d at 393-96 (affirming dismissal of Chapter 11 case based on the debtor's improper pre-petition conduct alone, including the debtor's "(1) factual misrepresentations and omissions on financial statements and bankruptcy pleadings; (2) violations of state court orders; [and] (3) extravagant lifestyle.").

## B. The issue of bad faith in this case

The Court has considered the relevant circumstances, including the eight non-exclusive factors listed in the *Trident Associates* case, quoted above, and finds and concludes that the Debtor's filing of this case under Chapter 11, rather than Chapter 7, was done in bad faith. This is so for the following reasons.

### 1. The *Trident Associates* factors

First, six of the eight *Trident Associates* factors are present in this case. Those are factor nos. 1-3 and 6-8. Specifically, the following factors are present:

**Factor no. 1**: "the debtor has one asset" — namely, the Property.

**Factor no. 2**: "the pre-petition conduct of the debtor has been improper." As discussed in detail below, the Debtor engaged in improper conduct during the pendency of its First Chapter 11 Case.

**Factor no. 3**: "there are only a few unsecured creditors." This is undisputed, and it is

10

shown by Debtor's schedules filed in this case.[15]  Aside from the City, which the Debtor lists as both a secured mortgage creditor in Schedule D and an unsecured creditor in Schedule E/F (for "taxes" in an "[u]nknown amount"), the Debtor's Schedule E/F lists no priority unsecured creditors, and lists only two creditors with claims in any amount.[16]  Those two creditors are related to the Debtor.  The first is Sidney Elhadad, the Debtor's sole member, who is listed as having an "insider claim" of $2.68 million based on "loans" to the Debtor.  The second is Trantor-Realty, Inc. ("Trantor"), which is listed as having a claim of $688,296.04 based on loans to the Debtor.  During the hearing, the Debtor's counsel stated that Trantor is owned by a business associate of Mr. Elhadad, and Trantor has employed Mr. Elhadad's son.

**Factor no. 6**: "the filing of the petition effectively allows the debtor to evade court orders."  The automatic stay, which arose upon the filing of the Debtor's bankruptcy petition under 11 U.S.C. § 362(a), has allowed the Debtor to evade at least three state court orders, which are described in Part III.C of this Opinion, above.  These are (1) the January 21, 2021 consent judgment in the 46th District Court case, which imposed ongoing duties on the Debtor to secure, maintain, and clean up the Property; (2) the recent show cause order issued in the 46th District Court case, which had required the Debtor to appear at a contempt hearing on February 16, 2023 because of the Debtor's alleged failures to comply with the January 21, 2021 consent order; and

---

[15]  Schedules D and E/F (Docket # 19).

[16]  In addition, the Debtor's Schedule E/F lists three creditors with claims of zero, apparently for notice purposes only.

(3) the January 24, 2023 receivership order entered in the Oakland County case.[17]

**Factor no. 7**: "the debtor has no ongoing business or employees."  This is undisputed.

**Factor no. 8**: "the lack of possibility of reorganization."  The Debtor has no hope or intention of reorganizing.  Rather, the Debtor hopes and intends only to liquidate.

### 2. Details about *Trident Associates* factor no. 2

As for Factor no. 2, the Court finds that the Debtor, through its sole member Sidney Elhadad, engaged in some improper conduct before filing the petition in this case, during the Debtor's First Chapter 11 case.  Months before the reorganization plan was confirmed in that case, Mr. Elhadad secretly caused the Debtor to enter into an undisclosed agreement, entitled "Commercial Purchase Agreement," to sell the Property to an individual named Xiao Hua Gong ("Mr. Gong").  Although that purchase agreement never closed, the timing, terms, and secretive nature of the agreement are very troubling to the Court, and cast serious doubt on Mr. Elhadad's suitability to manage the Debtor as a Chapter 11 debtor in possession in the current case.

Some relevant history from the First Chapter 11 Case, and key facts about this secret purchase agreement, include the following.

In the First Chapter 11 Case, on January 20, 2015, the Court denied confirmation of the Debtor's first proposed plan of reorganization, after the Oakland County Treasurer objected to it, and after the Court held an evidentiary hearing.[18]  During the evidentiary hearing, the Debtor asserted, and presented evidence, that the Property was worth $690,000.00, and the Court so

---

[17]  In fairness, the Court notes that the Debtor probably also would have been able to evade these three state court orders if it had filed this bankruptcy case under Chapter 7.

[18]  *See* Docket # 13-4; *see also* Docket ## 78, 79 in Case No. 14-42812.

12

found.  As a result, under Bankruptcy Code § 506(a), the Court limited the allowed secured tax claim of the Oakland County Treasurer to $690,000.00.[19]

After confirmation was denied, the Debtor filed an amended plan, but the Court denied confirmation of that plan on March 16, 2015, after the Debtor stated its intention to file another amended plan.[20]  The Debtor filed a second amended plan on March 23, 2015.[21]  The next day, the Court ordered mediation,[22] which after many months, ultimately led to confirmation of a consensual plan.

Meanwhile, on March 16, 2015, the Debtor filed a motion for authority to sell all of its assets, including the Property, under Bankruptcy Code § 363, to a purchaser named "KFG Southfield, LLC, c/o Salomon Knafo" of Atlanta, Georgia, for $1.5 million, subject to higher and better offers.[23]  The Oakland County Treasurer objected to that motion on March 30, 2015, and on April 7, 2015, the Court ordered mediation of that dispute.[24]  Ultimately the Debtor withdrew its sale motion, during a hearing held on November 23, 2015.[25]

The Debtor filed its third amended combined plan and disclosure statement (the "Third

---

[19]  *See* Docket # 13-4 at 7-8, 16, 45.

[20]  *See* Order, Docket # 99 in Case No. 14-42812.

[21]  Docket # 102 in Case No. 14-42812.

[22]  Docket # 106 in Case No. 14-42812.

[23]  Docket # 97 in Case No. 14-42812.

[24]  Docket ## 109, 114 in Case No. 14-42812.

[25]  *See* November 23, 2015 minute entry in Case No. 14-42812.

13

Amended Plan") on December 7, 2015.[26]  That plan was confirmed, with some substantial modifications, by a stipulated confirmation order entered on February 19, 2016.[27]

Eight days before the Debtor filed its Third Amended Plan, which included a disclosure statement designed to satisfy the disclosure statement requirement of 11 U.S.C. § 1125(b), the Debtor had received a written offer from Mr. Gong, in the form of a proposed purchase agreement signed by Mr. Gong on November 29, 2015.[28]  The Debtor accepted the offer, and entered into the purchase agreement with Mr. Gong, when Mr. Elhadad signed the agreement on behalf of the Debtor on December 15, 2015.[29]

The Debtor's disclosure statement filed on December 7, 2015 said nothing about Mr. Gong's offer to purchase the Debtor's Property that the Debtor received on November 29, 2015. It should have included information about that offer, and about the intention of the Debtor to accept the offer, in order to satisfy the requirement of 11 U.S.C. §§ 1125(a) and 1125(b) that the disclosure statement provide "adequate information."[30]

---

[26]  Docket # 146 in Case No. 14-42812.

[27]  Docket # 172 in Case No. 14-4812.

[28]  A copy of this purchase agreement, minus its Exhibit C, appears at Docket # 30-1 in this case. Mr. Gong's dated signature appears at pdf p. 10.  Another, somewhat more legible, copy of the purchase agreement, minus its Exhibit B, appears at Docket # 33 at pdf p. 17.

[29]  *See* Docket # 30-1 at pdf p. 10.

[30]  While the Debtor's disclosure statement said nothing about the purchase offer from Mr. Gong for $5.5 million ($3 million to the Debtor plus $2.5 million to Mr. Elhadad's favorite charity, as discussed below), the Debtor's disclosure statement *did* provide information about the Debtor's March 16, 2015 sale motion, which had proposed to sell all of the Debtor's assets to KFG Southfield for only $1.5 million.  *See* Third Amended Plan (Docket # 146 in Case No. 14-42812) at pdf pp. 31-32.  And the liquidation analysis in the disclosure statement asserted that the value of the Debtor's assets was "approximately $690,000 (fair market value) or $450,000 liquidation value."  *Id.* at pdf pp. 33, 50.

This failure to disclose is not the fault of the Debtor's attorney, however, who is the same attorney who represents the Debtor in the current case. *Mr. Elhadad did not tell his bankruptcy attorney about the purchase offer.*

Nor did Mr. Elhadad tell his bankruptcy attorney, or the Court, or any of the parties in interest in the bankruptcy case, about the Debtor's acceptance of Mr. Gong's offer and entry into the purchase agreement on December 15, 2015. No amended disclosure statement was ever filed to disclose this purchase agreement. Nor was it ever disclosed in any other way during the pendency of the First Chapter 11 Case. Rather, during the hearing in this case, both the Debtor's attorney and the City's attorney stated that they first learned of the purchase agreement with Mr. Gong sometime during the summer of 2016, several months after confirmation of the Debtor's Third Amended Plan.[31]

The failure of Mr. Elhadad and the Debtor to timely disclose the purchase agreement with Mr. Gong is troubling, but that failure to disclose is made even more troubling by some of the terms of that secret agreement. The agreement provided that the purchaser was to pay the Debtor $3 million for the Property. This price was much higher than the $690,000.00 valuation placed on the Property by the Debtor and the Court that led to the Court's January 20, 2015 decision valuing the Property at $690,000.00. And this price was much higher than the $1.5 million purchase price proposed by the Debtor's March 16, 2015 sale motion, and the $690,000 "fair

---

[31] Mr. Elhadad admits that he did not disclose the Gong purchase agreement to the Court or even to the Debtor's own "professionals," such as the Debtor's bankruptcy counsel. Nor did he have any "Michigan counsel" review the agreement at the time. *See* Sidney Elhadad Declaration at (Docket # 33), at at pdf pp. 11, 12 ¶¶ 9, 11).

market value" placed on the Property by the Debtor's disclosure statement filed with the Debtor's Third Amended Plan.[32]

Moreover, the $3 million purchase price in the Debtor's secret purchase agreement with Mr. Gong was not really even the full purchase price. The purchase agreement also required the purchaser, Mr. Gong, to make a $2.5 million donation to a charity in Montreal, named Institut Yavne, as part of the closing of the sale.[33] Mr. Elhadad was the President of that charity, and its founder.[34] The effect of this donation provision in the Debtor's purchase agreement with Mr. Gong would have been to divert $2.5 million in value away from the Debtor and to a charity favored by the Debtor's sole member, Mr. Elhadad. That is, the Debtor, through Mr. Elhadad, agreed to sell the Property, which was property of the bankruptcy estate, and divert $2.5 million of the real purchase price away from the Debtor and the bankruptcy estate.[35]

Further troubling to the Court is that Mr. Elhadad secretly caused the Debtor to agree to sell the bankruptcy estate's only real asset, a sale that obviously would be "other than in the ordinary course of business" within the meaning of 11 U.S.C. § 363(b)(1), and the Debtor never gave notice of the sale agreement. At the time of this purchase agreement, the First Chapter 11

---

[32] *See* discussion in footnote 30 above.

[33] *See* Docket # 30-1 at pdf p. 12 ("Exhibit B" to the Commercial Purchase Agreement).

[34] *See* Docket # 30-2 at pdf pp. 2, 4.

[35] It is possible that Mr. Elhadad thought that the $3 million purchase price in the agreement with Mr. Gong would provide the Debtor with enough money to pay all allowed claims in the First Chapter 11 Case and leave a surplus for the Debtor, for the benefit of Mr. Elhadad, for him to do with as he pleased. It is not clear, on the present record, that Mr. Elhadad actually thought that, but even if he did, that would not excuse Mr. Elhadad's secretly making an agreement for the Debtor to sell the property of the bankruptcy estate and unilaterally divert away $2.5 million of the sale proceeds from the estate.

16

Case had been pending for almost 22 months, and it was more than two months before a plan was confirmed. At that time, the Debtor obviously could not sell its property in this way, except "after notice and a hearing" under § 363(b)(1). No such notice was ever given. This too was not the fault of the Debtor's bankruptcy attorney, because Mr. Elhadad did not tell his bankruptcy attorney about the secret purchase agreement with Mr. Gong.

Mr. Elhadad's explanation as to why he did not tell anyone, not even his own bankruptcy attorney, about the purchase agreement with Mr. Gong, is this:

> Though I signed the Southfield Purchase Agreement in December 2015, I did not inform the Bankruptcy Court of the transaction, or my professionals, because I did not know the prospective buyer and his wherewithal, it was subject to a due diligence period, and the prospective buyer was to purchase another property that I had an interest in [the former Dearborn Hyatt], before I could be comfortable that he was a real buyer who could close on Southfield.[36]

This explanation is not a valid excuse for Mr. Elhadad's failure to disclose the purchase agreement, especially given the timing and the terms of that agreement, described above. And despite what Mr. Elhadad now says, it is clear that Mr. Elhadad viewed this purchase agreement with Mr. Gong as quite real when it was made. The agreement required Mr. Gong to pay a cash deposit of $500,000.00 Canadian, and he did so. The deposit was held in escrow by Mr. Gong's real estate broker. Later, the sale fell apart and that led to extensive litigation between the Debtor and Mr. Gong in the Oakland County Circuit Court. In that litigation, the Debtor and Mr. Elhadad fought hard to keep the $500,000.00 deposit. But the court ordered that the $500,000.00

---

[36] Sidney Elhadad Declaration (Docket # 33), at pdf p. 12 ¶ 11).

deposit be returned to the purchaser, Mr. Gong, and that decision was later affirmed by the Michigan Court of Appeals.[37]

In making the purchase agreement with Mr. Gong when and as it did, and then in failing to disclose the agreement, as described above, the Debtor engaged in improper conduct. This means that *Trident Associates* factor no. 2 is present, and tends to show a bad faith filing of this Chapter 11 case. But it shows more than that. It also shows that Mr. Elhadad, the Debtor's sole member and the only person in this case who would be managing the Debtor as a Chapter 11 debtor in possession, is not a suitable person to do so.

### 3. Additional indicators of a bad faith filing

Consideration of the *Trident Associates* factors tends to show that the Debtor filed the current Chapter 11 case in bad faith. But there are additional considerations that show that, taken together with the *Trident Associates* factors, the Debtor filed this bankruptcy case under Chapter 11, rather than under Chapter 7, in bad faith.

The Debtor's stated goal of filing Chapter 11 is to market and sell the Debtor's Property. But the Debtor, and its sole member, should not be in charge of that effort in this bankruptcy case. Instead, a disinterested Chapter 7 Trustee should be.

The Debtor now has a long history of trying to sell the Property, and has not succeeded in doing so. This suggests that a Chapter 7 Trustee should now manage efforts to sell the Property, rather than the Debtor under the control of Mr. Elhadad.

---

[37] *See* Sidney Elhadad Declaration (Docket # 33), at pdf p. 10 ¶¶ 3-7); *Shefa, LLC v. Gong*, Case No. 337629 (Mich. Ct. App. Oct. 4, 2018) (unpublished) at 3, 8 (copy at Docket # 30-3).

The Debtor's Property, a former hotel, has now been closed and vacant for 13 years. The Debtor's efforts to sell the Property include attempts during the First Chapter 11 Case to sell the Property, first to KFG Southfield for $1.5 million, as proposed in the Debtor's March 16, 2015 sale motion, and second, to Mr. Gong as part of the secret December 2015 purchase agreement, for $5.5 million ($2.5 million of which would have been diverted to Mr. Elhadad's charity). The Debtor's failed efforts to sell the Property also include, more recently, a May 26, 2022 sale agreement, under which the Debtor was to sell the Property to Contour Acquisitions LLC for $4.75 million.[38]

The Debtor alleges that it can succeed in selling the Property in Chapter 11, and has filed an application to employ a commercial real estate broker, Colliers International ("Colliers"). On March 2, 2023, in opposing the conversion of this case to Chapter 7, the Debtor filed an undated Declaration of Robert Haver, Vice President of Colliers. Among other things, the Declaration says that Mr. Haver "ha[s] been working on selling [the Property] . . . for about one year."[39] Yet despite that year of working to sell the Property, the Debtor has not managed to obtain any purchase agreement with anyone, or even to obtain a firm written offer for the Property, with two exceptions. Those two exceptions are the May 26, 2022 failed purchase agreement with Contour Acquisitions LLC, discussed above, and a purchase agreement that the Debtor just signed on March 29, 2023. As discussed below, the latter purchase agreement merely gives the proposed purchaser an opportunity to buy the Property. It does not actually impose any obligation to do so

---

[38] *See* "Real Estate Sale Agreement" (Docket # 30-4).

[39] Docket # 27 at pdf p. 19 ¶ 3.

at all.

Mr. Haver's March 2, 2023 Declaration is limited to what can fairly be dubbed as hopes and dreams. Mr. Haver states that during 2022, Colliers received "5 verbal offers" in the range of $3-5 million from "experienced Hotel Groups."[40] But he identifies no written offer from any of these prospective buyers. Then he says that "[i]n the past week through increased marketing efforts, we have identified four strong buyers that are interested in making an offer."[41] But again, he identifies no written offers.

Finally, Mr. Haver states that "[a]ttached is the Letter of Intent from a quality group for $5.5 million."[42] But that "letter of intent," dated February 28, 2023 from H&T Capital Associates,[43] expressly states in several places that it is non-binding, and subject to the negotiation and execution of a purchase agreement. And it contains numerous contingencies and qualifications. For example, it says that any purchase agreement between the parties will provide the buyer with a due diligence period, and that the buyer can terminate the purchase agreement at any time during the due diligence period, without any reason, "at its sole and absolute discretion."[44]

Nine days after the Court held the hearing on the City's Motion and took it under

---

[40] *Id.*

[41] *Id.*

[42] *Id.* at pdf. p. 19 ¶ 4.

[43] Docket # 27 at pdf p. 21 (the "Letter of Intent").

[44] Letter of Intent at ¶ 2.

advisement on March 22, 2023, the Debtor filed a motion for authority to sell the Property (the "Sale Motion").[45]  That motion was filed on Friday, March 31, 2023, one business day before the Court is issuing this Opinion.  The Court has reviewed the Debtor's Sale Motion, and the purchase agreement attached to it.  The Sale Motion seeks authority for the Debtor to sell the Property free and clear of liens, under 11 U.S.C. §§ 363(b)(1) and 363(f), for $5.9 million, under a purchase agreement with ABC-Merit Partners 2, LLC.  The purchase agreement was signed by the Debtor and the prospective buyer on March 29, 2023.

While it is possible that this purchase agreement might lead to a sale of the Property, it is also quite possible that it will not.  The terms of this purchase agreement do not obligate the prospective buyer to actually buy the Property, *or to do anything*.  In practical effect, the agreement, if authorized by the Court, would merely give the prospective buyer an *opportunity* to buy the Property, but no obligation whatsoever to do so.

The terms that lead the Court to these conclusions include the following:

• Section 1.7 of the agreement provides for the Purchaser to make an "Earnest Money Deposit" of $500,000.00 to an "Escrow Agent," "within five 5 business days of the execution and delivery of this Agreement by Purchaser, Seller and Escrow Agent."[46]  The agreement has been executed by the Purchaser and the Seller, but there is no indication that any "Escrow Agent" has executed it yet.  In any event, the $500,000.00 deposit is not in cash; rather, it is merely to be a promissory note, payable upon demand "upon [the Purchaser's] issuance of" a "Notice to

---

[45]  Docket # 38 (the "Sale Motion").

[46]  Purchase Agreement (Docket # 38) at pdf p. 20 § 1.7.

Proceed."[47]

• Under § 1.7, the "Earnest Money" promissory note must be converted to cash within 72 hours after the expiration of a 60 day "Inspection Period."[48]  But the only remedy for the Purchaser's failure to convert the deposit to cash by that deadline is that the purchase agreement "will automatically terminate," the Earnest Money promissory note will be returned to the Purchaser, and the Purchaser will have no obligation or liabilty to the Debtor.[49]

• The Purchaser has a 60-day "Inspection Period" to inspect the Property, obtain and review title work, and conduct other due diligence.[50]  Before the expiration of the Inspection Period, the Purchaser may deliver a "Notice to Proceed" to the Seller, which would mean at that point that the Purchaser "agrees to complete the transaction."[51]  But the Purchaser has no obligation whatsoever to deliver the "Notice to Proceed."  And if the Purchaser does not timely deliver the "Notice to Proceed" for any reason, or if the Purchaser delivers a written notice of termination at any time during the Inspection Period, the Purchase Agreement "will automatically terminate," the Earnest Money promissory note will be returned to the Purchaser, and the Purchaser will have no obligation or liabilty to the Debtor.[52]  The Purchaser has complete

---

[47]  *See id.* at § 1.7 and Exhibit B thereto at pdf pp. 37-38.

[48]  Purchase Agreement at § 1.7.

[49]  *See id.*

[50]  *See id.* at pdf pp. 20-21 § 2.1, 2.2, 3.1, 3.2.

[51]  *See id.* at pdf p. 21 § 2.2

[52]  *See id.*

discretion to terminate the purchase agreement in these ways.

There are other provisions in the Purchase Agreement that also give the Purchaser certain rights to terminate the agreement without liability,[53] but the provisions described above are enough to show that at present, the March 29, 2023 Purchase Agreement is entirely illusory for the Debtor and the bankruptcy estate. Eventually it might turn into something real, but at this point it is not something real.

If this case is converted to Chapter 7, the Chapter 7 Trustee may decide to pursue a purchase agreement with the Debtor's latest prospective buyer, or with some other prospective buyer, as the Trustee thinks best in the exercise of his or her fiduciary duty and business judgment.

During the hearing, counsel for the Debtor and the City both stated that if this case is converted, the Chapter 7 Trustee will be able to employ Colliers as a broker, if the Trustee so chooses.[54] Or the Trustee could employ some other broker of his or her choosing. And of course, the Trustee could try to make a suitable sale agreement with one of the prospective buyers that has informally expressed interest to Colliers. There is no reason to think that a Chapter 7 Trustee would be any less effective than the Debtor (as debtor in possession in Chapter

---

[53] *E.g., id.* at pdf p. 21 § 3.3.

[54] This would depend, in part, on whether Colliers truly is "disinterested," as the Debtor and Colliers have asserted in the Debtor's application seeking authority to employ Colliers. *See* Debtor's App. to Employ Real Estate Broker [etc.], filed February 10, 2023 (Docket # 14) at ¶ 5, and attached "Verified Declaration of Robert Haver" at ¶ 6. The Court has not yet ruled on that employment application. On the present record, the Court is unable to verify that Colliers is a "disinterested person," as that term is used in 11 U.S.C. § 327(a), and as that term is defined in 11 U.S.C. § 101(14). It is not yet clear, for example, whether or not Colliers is a pre-petition creditor of the Debtor.

11) in marketing and selling the Property. Rather, the Debtor's history of failed efforts to sell the Property suggests that a disinterested Chapter 7 Trustee likely would be more effective.

**4. Other arguments by the Debtor are unpersuasive.**

**a. Chapter 7 administrative expenses vs. Chapter 11 administrative expenses**

The Debtor argues that it filed this case under Chapter 11 rather than Chapter 7, in part, to avoid the administrative expenses that would be incurred if a Trustee sold the Property in Chapter 7. Such Chapter 7 expenses would include a reasonable Trustee fee under 11 U.S.C. §§ 326(a) and 330, and reasonable attorney fees under 11 U.S.C. §§ 330 for any attorney(s) hired by the Trustee. But this concern must be weighed against the fact that conversion to Chapter 7 would save certain types of administrative expense that likely would be incurred if the case were to remain in Chapter 11.

In this regard, the City cites the opinion by this Court in the case of *In re TAJ Graphics Enterprises, LLC*, 600 B.R. 1 (Bankr. E.D. Mich. 2019). In that case, the Court converted a Chapter 11 case to Chapter 7, and while that case was quite different from this one, the Court's following observations fit this case:

> This Court agrees [that "cause" exists under 11 U.S.C. § 1112(b)(1) to either dismiss or convert this case]. If the Debtor remains in bankruptcy, it can only be for a liquidation. There is no possibility, and no thought by anyone, that the Debtor can reorganize in Chapter 11. Given this, if the Debtor is to remain in bankruptcy, there is no reason for the liquidation to occur in Chapter 11. In this case, it will be more cost-efficient for a bankruptcy liquidation to take place in Chapter 7. For one thing, **under Chapter 7, there will be no need for any party to incur the time and expense of proposing and filing a liquidating Chapter 11 plan (and filing an accompanying disclosure statement), and then going through the process of obtaining**

24

> **confirmation of such a plan.**

600 B.R. at 3 (emphasis added). In this case, the administrative expenses, including attorney fees of the Debtor's counsel, incurred in obtaining confirmation of a plan could be significant. They were certainly significant in the Debtor's First Chapter 11 Case, given the disputes that had to be resolved to confirm a plan in that case (albeit a reorganization plan rather than a liquidating plan.)[55] Those administrative expenses will be avoided if the case is in Chapter 7 rather than Chapter 11.

### b. The estate's current lack of funds

The Debtor argues that if this case had been filed under Chapter 7, or were to be converted to Chapter 7 now, the Chapter 7 Trustee would have no money to keep the Property insured, secured, or maintained, at least not until the estate received proceeds of a sale of the Property. But that is because the Debtor came into this case having no money with which to keep the Property insured, secured, or maintained. The only way the Debtor could do these things post-petition is by obtaining credit post-petition from somewhere. The Debtor suggests that it can obtain funding in this case, if necessary, as it has done pre-petition, from its sole member and creditor, Mr. Elhadad, or from its creditor Trantor. Both of these creditors claim to have loaned money to the Debtor pre-petition, on an unsecured basis. But if the Debtor is to obtain credit post-petition, even on an unsecured basis, the Debtor must file a motion seeking

---

[55] For example, in the prior case, the Court allowed $72,525.00 in fees to the Debtor's attorney, for his work in the time period leading up to and just after the confirmation of the Debtor's plan. *See* Order Awarding Fees and Expenses [. . .], filed June 20, 2016 (Docket # 198 in Case No. 14-42812). And that fee amount was requested by the Debtor's attorney after he voluntarily "'no-charged' a significant amount of time in the exercise of billing judgment." *See* Final Fee Application for Debtor's Counsel, filed April 27, 2016 (Docket # 191 in Case No 14-42812) at 1 ¶ 2.

authority to do so, under 11 U.S.C. § 364(b), and notice and a hearing is required. The Debtor has filed no such motion, and so far, it has not formally disclosed any post-petition funding.[56] During the March 22, 2023 hearing on the City's Motion, the Debtor's attorney stated that he did not know if anyone had provided any post-petition loans or funding to the Debtor.

In any event, if Mr. Elhadad or Trantor, or anyone else, is willing to provide funding for the Debtor in Chapter 11 to bridge it to a closing of a sale of the Property, there is no reason apparent (or argued by the Debtor) why such source(s) would not also be willing to provide such funding to a Chapter 7 Trustee, after proper notice and hearing and with the approval of the Court.

### 5. Conclusion about bad faith

Based on the factors and other considerations described above, the Court finds and concludes that the Debtor filed this bankruptcy case under Chapter 11 in bad faith, and should have filed this case under Chapter 7. As a result, there is "cause" under Bankruptcy Code § 1112(b)(1) to dismiss or convert this case.

### 6. Conversion to Chapter 7, rather than dismissal, is in the best interests of creditors and the estate.

Based on the considerations discussed above, the Court finds and concludes that a conversion of this case to Chapter 7, rather than dismissal, is "in the best interests of creditors and the estate," within the meaning of 11 U.S.C. § 1112(b)(1). No one disputes this conclusion,

---

[56] During the March 22, 2023 hearing on the City's Motion, counsel for the City and counsel for the United States Trustee recounted some testimony that was given by Mr. Elhadad at the § 341 meeting of creditors on March 7, 2023. Reportedly, Mr. Elhadad testified that the Debtor had borrowed money from Trantor during the prior week (*i.e.*, post-petition), under a pre-petition line of credit.

and the City's Motion seeks conversion rather than dismissal. This case should be converted to Chapter 7.

## V. Conclusion

For the reasons stated above, the Court will enter an order granting the City's Motion and converting this case to Chapter 7.

**Signed on April 3, 2023**



/s/ Thomas J. Tucker
**Thomas J. Tucker**
**United States Bankruptcy Judge**